_____

FENNER PRECISION, INC.,

                          Plaintiff                    DECISION AND ORDER

-vs-
                                                       12-CV-6610 CJS

MEARTHANE PRODUCTS CORP. and
PHILIP J. GARROD,

                          Defendants

_____

APPEARANCES

For Plaintiff:                Svetlana K. Ivy, Esq.
                              Douglas A. Foss, Esq.
                              Harris Beach PLLC
                              99 Garnsey Road
                              Pittsford, New York 14534

For Defendant Mearthane
Products Corp.:               Andrew J. Ryan, Esq.
                              Woods Oviatt Gilman LLP
                              700 Crossroads Bld.
                              Two State Street
                              Rochester, New York 14614


INTRODUCTION

This is an action to enforce restrictive covenants between a manufacturing

company and its former employee.  Before the Court is the employer-plaintiff's motion for

preliminary injunctive relief.  The application is denied.

BACKGROUND

In 1983 Defendant Phillip Garrod ("Garrod") began working as a salesman in the

field of elastomeric precision products ("EPP").  Since then, Garrod has worked

exclusively in the EPP field, primarily selling products to original equipment

manufacturers ("OEMs").  In 2000, after having worked as a salesman in the EPP field for

1

seventeen years, Garrod was hired by Winfield Industries ("Winfield"), a manufacturer of EPP products. Winfield hired Garrod primarily because he already had an established sales relationship with Xerox Corporation, and Winfield hoped to begin selling EPP products to Xerox. Winfield's hopes in that regard were realized, as Garrod subsequently built up a significant sales relationship between Winfield and Xerox. As part of his employment with Winfield, Garrod was subject to a non-compete agreement containing various restrictive covenants.

Plaintiff Fenner Precision, Inc. ("Fenner") is another manufacturer of EPP parts. On March 3, 2008, Fenner purchased Winfield and hired Winfield's staff, including Garrod. On that same day, Fenner's human resources staff met with the Winfield employees and had them sign various documents in connection with the transfer of their employment from Winfield to Fenner. Fenner contends that at that time it had all the former Winfield employees, including Garrod, sign non-compete agreements.[1] However, Garrod maintains that he was not asked to execute any restrictive covenants during that initial meeting. Instead, Garrod contends that he specifically recalls signing the Agreement either later that day or during the following two days. Consequently, there is some dispute as to the exact moment that Garrod signed the agreement, but the parties agree that he signed it within the first two days of his employment with Fenner. Garrod maintains that Fenner representatives told him that he had to sign the non-compete agreement, but they did not specifically say that it was a condition of his employment that he do so.

---

[1] None of Fenner's witnesses have any personal knowledge as to exactly when Garrod signed the agreement. Instead, they argue that it is reasonable to infer that he signed the non-compete agreement on March 3, 2008, since the agreement bears that date, and since Garrod signed several other employment-related documents that day.

The non-compete agreement that Garrod signed is entitled "Fenner Precision Associate Confidential Information, Invention & Non-Compete Agreement" ("the Agreement"). The Agreement essentially contains three restrictive covenants: 1) a confidentiality provision; 2) a non-compete provision; and 3) a non-solicitation provision. The confidentiality provision forbids Garrod from using any Confidential Information, except in connection with his employment by Fenner.[2] The non-compete provision states that for a period of one year after ending his employment with Fenner, Garrod will not render services to a competitor.[3] Finally, the non-solicitation provision indicates that for a period of one year after ending his employment with Fenner, Garrod will not solicit business from any of Fenner's "current, past or prospective customers," "in any manner," or "interfere with any of the Company's accounts or business with any Customer." The Agreement contains a Pennsylvania choice-of-law provision.

Garrod worked for Fenner for four years, from March 2008 until May 2012. Garrod's title was "Business Development Manager," and in that regard his duties included promoting Plaintiff's products and working with customers to develop new products. Garrod spent approximately two weeks each month traveling to meet with Fenner's customers. Garrod maintains, though, that he was already familiar with all of the potential buyers of Fenner's products from having worked in the EPP industry for over twenty years. During his tenure at Fenner, Garrod made approximately 90% of his sales to four major OEMs which purchased rollers for digital imaging and health imaging

---

[2]The Agreement defines "Confidential Information" as "any and all information disclosed or made available to the Employee or known by the Employee as a consequence of or through his employment by the Company and not generally known in the industry in which the Company is or may become engaged, or any information related to the Company's products, processes, or services, including, but not limited to, information relating to research, development, inventions, manufacture, purchasing, accounting, engineering, marketing, merchandising or selling." Agreement ¶ (1)(b).

[3]Under the agreemennt, competitors are referred to as "Conflicting Organizations," which are any organizations selling a product that competes with Fenner's products. *Id.* at ¶ ¶ (1)(d)&(e).

printers.  Garrod already had established sales relationships with those companies prior to working for Fenner.

In October 2011, Fenner hired a new sales employee and gave him the title "Digital Imaging Sales Manager," while changing Garrod's title to "EPP Sales Manager." Garrod viewed this change as a demotion, since Fenner directed him to transfer all of the commercial printing accounts, which accounted for approximately 90% of Fenner's sales, to the new employee.  During the next several months, at Fenner's direction, Garrod took the new employee along on sales calls, and introduced him to Fenner's customers.

In May 2012, Plaintiff terminated Garrod's employment.  Fenner has not offered any reason for terminating Garrod's employment.  At that time Garrod was approximately 58 years of age.  Fenner offered Garrod a severance package in exchange for him signing a "Severance Agreement and General Release" ("the Severance Agreement"). The Severance Agreement included non-compete, non-disclosure and non-solicitation covenants, lasting a term of one year, which purported to impose obligations in addition to those imposed by the Agreement.  Specifically, in pertinent part, the Severance Agreement would have barred Garrod from doing the following: 1) working in any business relating to the manufacture or sale of competing products; 2)  contacting or soliciting any current or past Winfield or Fenner customers, including, but not limited to, forty-three (43) specifically-named customers; and 3) disclosing Fenner's confidential and/or proprietary information.  Garrod declined to sign the Severance Agreement, purportedly because he believed that it would preclude him from working in the EPP industry, and would make it "almost impossible" for him to find a job outside of the EPP industry.

Garrod maintains, and it is undisputed at present, that he did not take any of Fenner's confidential materials with him when he left Fenner's employ.  Garrod further

maintains that he has no independent recollection of Fenner's product pricing, since most of the parts were custom-made and had differing prices. Garrod also denies having any technical knowledge, since he is not an engineer or scientist, and was not involved in the actual manufacturing of Fenner's products. In that regard, Garrod states that when making sales calls, he would often have to take one of Fenner's "technical person[s]" with him. Garrod Aff. [#8] at ¶ 68; *see also, id*. at ¶ 58 ("While I have general knowledge of elastomeric precision products, I know nothing about the formulations of the specific materials that are used to make the items.").

In attempting to locate new employment after being terminated by Fenner, Garrod sent out approximately sixty resumes for "general sales positions," which the Court understands to mean positions outside of the EPP industry, and received only four responses, all of which were rejections. Garrod also sent out eight resumes to EPP companies, and received three interviews. Eventually, in or about May 2012, Garrod accepted a sales position with defendant Mearthane Products Corp., an EPP manufacturer that competes with Fenner. Upon commencing employment with Mearthane, Garrod sent out emails to the various customers that he knew from his entire career, and informed them that he was working for Mearthane. One such email was to a Fenner customer that used EPP rollers in the manufacture of cigarettes.

Garrod also began making sales calls to his former EPP customers, and particularly focused his attention on commercial printing manufacturers. In that regard, Garrod states: "I have been in this business for over 25 years and I am aware of all of the digital printer manufacturers in the world and I have known the people in charge of buying for those companies for many years. That number of customers is very small and I had sold products to each and every one of those customers prior to becoming employed by Fenner." Garrod Aff. [#8] at ¶ 48. Garrod also made a sales call to BASF/Watson

Bowman Acme ("BASF"), whose purchasing manager, Robert Kostran ("Kostran"), Garrod had known for over ten years. Garrod asked Kostran if he was interested in purchasing any products from Mearthane, and Kostran asked Garrod to provide a quote for an elastomer bridge expansion joint, which BASF was currently buying from Fenner. Garrod eventually provided such a quote, though BASF did not purchase the item from Mearthane. In fact, Garrod indicates that he has not closed a single sale to any of Fenner's customers since he began working for Mearthane.

Garrod indicates, contrary to what Fenner suggests, that the identities of all of the potential EPP customers are not secret, and are readily available to anyone. For example, he states that he recently attended a trade show where all attendees were given contact information for EPP companies in the printing industry. In any event, Garrod reiterates that he was already familiar with the various EPP customers before he began working for Fenner. Garrod further states that the products that those customers buy, as well as the products that Fenner sells, are not secret, but instead, are readily discernible from those companies' websites. Garrod also states that pricing is not confidential, since EPP customers are happy to tell salesmen what they are currently paying for products, in the hopes of obtaining a better price.

In or about August 2012, some of Fenner's employees attended a trade show, where they encountered Garrod, and learned that he was working for Mearthane. On October 9, 2012, Fenner's attorneys wrote to Garrod, and declared that he was violating the agreement's non-compete provision by working for Mearthane. *See*, Ryan Decl., Ex. A. ("By accepting employment with Mearthane, you are in clear violation of the Agreement as Mearthane is a Conflicting Organization selling Conflicting Products."). Fenner further demanded that Garrod terminate his employment with Mearthane. *Id*. ("Fenner Precision demands that you terminate your current relationship with

Mearthane."). Garrod's attorney responded that Garrod was not disclosing confidential information, and that the agreement was unenforceable.

On November 13, 2012, Fenner filed the subject action, along with an application for preliminary injunctive relief. Contrary to its former "cease and desist" letter, in this action Fenner is not presently attempting to enforce the non-compete covenant. That is, Fenner is not objecting to Garrod's employment with Mearthane in general, even though Mearthane is clearly a competitor.[4] Fenner is, however, seeking enforcement of the confidentiality provision and the non-solicitation provision.

Fenner contends that Garrod has violated the non-solicitation clause. Fenner contends that Garrod may also be violating the non-disclosure clause, though they have no proof of that as yet. On that point, Fenner contends that Garrod is actively attempting to make sales to its customers, and that in doing so, he is in a position to utilize confidential information that he obtained during his employment with Fenner. With regard to his solicitation of Fenner's customers, Fenner alleges that Garrod is violating the non-solicitation covenant, since in soliciting Fenner's customers, he is exploiting "goodwill" that he personally built up with the customers at Fenner's expense. *See*, Complaint [#1] ¶ 1 ("[Fenner] seeks an injunction prohibiting [Garrod] from using the information and goodwill he obtained in the course of his employment at [Fenner] to solicit [Fenner's] customers[.]"); *id*. at ¶ 27 ("[Garrod] enjoyed considerable good will as a result of [Fenner's] continuing and substantial expenditures to assure that he maintained such good will for Fenner Precision.").

Fenner relies on several specific instances in which it believes that Garrod has

_____

[4]Fenner maintains, though, that Mearthane tortiously interfered with the Agreement by hiring Garrod. On that point, Fenner's Complaint states that Mearthane is "inducing Garrod to breach the Agreement so as to use the knowledge and goodwill Garrod obtained as a result of [Fenner's] expenditure over many years t cultivate such customer good will to solicit and poach customers from Fenner[.]"). Complaint [#1] ¶ 49.

violated the non-solicitation provision. First, Fenner cites Garrod's contact with BASF, discussed earlier. Fenner argues that this is a clear violation of the non-solicitation clause, and that is could also implicate the non-disclosure clause, since Garrod knows that Fenner sells bridge expansion joints to BASF, and Mearthane has never previously sold bridge expansion joints. Fenner contends that Garrod's contact with BASF was harmful to Fenner, even though BASF did not buy any product from Mearthane, because BASF later used the threat of switching to Mearthane to extract a concession from Fenner. Garrod, though, denies that he used any confidential information in soliciting BASF. In that regard, Garrod has submitted an affidavit from Kostran, BASF's Purchasing Manager, that states, in pertinent part:

> I have known Philip J. Garrod for approximately 10 years and have worked with him in the past to purchase items from him at the different companies where he was employed. In September 2012, Mr. Garrod visited me to find out if Watson Bowman had any urethane or silicone molded products that his new company could assist with in providing to Watson Bowman in the future. Mr. Garrod did not specifically refer to any parts that Watson Bowman had purchased in the past, or is currently purchasing from [Fenner]. Mr. Garrod indicated to me that he was looking for any opportunities with new products or existing products. There was one product in specific that I discussed with Mr. Garrod and that is a product that Watson Bowman is currently purchasing from Fenner. Mr. Garrod did not have any details on the product and therefore he requested, and I . . . provided to him, a complete set of part specifications, a sample part and I told him a target price that he would need to meet if we were going to purchase the product from [Mearthane]. The information that I supplied to Mr. Garrod is the same information that I would supply to any other vendor asking to quote an opportunity.

Kostran Aff. ¶ ¶ 2-6 ( ¶ numbers omitted).

As another example of Garrod's alleged violation of the Agreement, Fenner cites Garrod's contact with Fenner's tobacco-manufacturing customer. Fenner contends that

this is another clear violation of the non-solicitation clause, and that is could also implicate the non-disclosure clause, since Garrod knows that Fenner sells tobacco rollers to the customer, and Mearthane has never previously sold such rollers. However, Garrod indicates that he merely sent an email to this customer, informing it that he was working for Mearthane, and that he did not mention any specific product.

On November 13, 2012, Fenner filed a motion for a temporary restraining order ("TRO"). Upon receiving the TRO application, the Court scheduled the matter for an appearance on Friday, November 16, 2012, at 4:00 p.m. On November 14, 2012, court staff had a telephone conference with counsel. Garrod's attorney, Mr. Ryan, indicated that Garrod had been out of town, and that he would not be able to meet with him until Thursday, November 15th, and that accordingly he would not be able to file responsive papers prior to the court appearance. Ryan indicated, though, that he did not believe that the Agreement was enforceable. On November 16, 2012, counsel appeared before the undersigned, and the Court adjourned the matter until November 20, 2012, and set a briefing schedule.

On November 20, 2012, counsel again appeared before the undersigned. Following arguments, the Court denied Plaintiff's application, since there was evidence from Garrod that the Agreement was unenforceable for lack of consideration. On that point, Garrod indicated that he did not sign the agreement until some time after he began working for Fenner, and that he was not given any additional consideration for signing the Agreement. In response, Fenner argued that the Agreement was supported by consideration since Garrod signed it on the first day of his employment, as a condition of such employment. Fenner argued that it was reasonable to infer that Garrod had actually signed the Agreement on the first day of his employment with Fenner, March 3, 2008, since the Agreement bore that date. Significantly, though, there was no evidence in the

record as to the date that Fenner acquired Winfield, or as to when Garrod actually began working for Fenner. Moreover, Fenner did not produce an affidavit from anyone with personal knowledge of the circumstances under which Garrod signed the Agreement. Accordingly, the Court orally denied Fenner's TRO application, but indicated that it would revisit the application if Fenner produced evidence to establish that the Agreement was supported by consideration under Pennsylvania law.

On December 3, 2012, Fenner filed the subject renewed application for preliminary injunctive relief. To counter Garrod's contention that the Agreement was unenforceable for lack of consideration, Fenner submitted evidence purporting to show that Garrod in fact signed the Agreement immediately upon commencing employment with Fenner, as a condition of such employment. Specifically, Fenner submitted an affidavit from its General Manager, Sean Gallagher ("Gallagher"), indicating that Fenner's purchase of Winfield was completed on March 3, 2008, the same day that the Agreement is dated. Gallagher further states that according to his recollection, all Winfield employees signed restrictive covenant agreements, and all other employment-related documents, on March 3, 2008, and that Garrod therefore could not have worked for Fenner prior to signing the Agreement.

Gallagher further indicates that although Garrod may have obtained knowledge of the elastomer products industry prior to working for Fenner, he gained further specific valuable information about Fenner and its customers during his employment with Fenner which is protected by the Agreement.

On December 19, 2012, Garrod filed responding papers, in which he again contends that the Agreement is not supported by adequate consideration. With respect to this contention, he reiterates that he was never specifically told that signing the Agreement was a condition of his employment. In addition, Garrod continues to maintain

that he did not sign the Agreement on the morning of March 3, 2008, as Gallagher states. However, Garrod admits that he may have signed the Agreement sometime later that day, and that he definitely signed it sometime between March 3rd and March 5th.

Garrod further contends that enforcing the Agreement against him would be unreasonable, because if he cannot solicit Fenner's customers, he cannot earn a living in the elastomer products industry, since the field of potential clients is relatively small, and he is at an age, fifty-eight, when it is difficult to find other employment. Garrod further states that whatever information he possesses about Fenner's customers was gained over the course of his entire career, and is not confidential information belonging to Fenner.[5]

On December 20, 2012, the Court heard oral argument on the renewed application. Regarding the non-disclosure provision, Fenner admitted that it has no information that Garrod has actually violated the non-disclosure provision yet. Nonetheless, Fenner maintains that there is still a risk of such disclosure. As for the non-solicitation clause, Fenner contends that the clause need not be reasonable to be enforced under Pennsylvania law. However, Fenner contends that even if non-solicitation clauses are subject to a reasonableness standard, then the subject clause is reasonable as is, or can easily be amended by the Court to be made reasonable.[6] On the other hand, Garrod continues to maintain that the Agreement is unenforceable, because it lacks consideration and because it is not reasonable. Garrod argues that the

---

[5]Garrod also argues that Fenner should be barred from obtaining injunctive relief because it waited too long before making such an application. However, the Court disagrees.

[6]On this point, Fenner concedes that if the non-solicitation clause was interpreted to cover literally every "current, past or prospective customer," then it might not be reasonable, since it might include customers who had no dealings with Garrod. Instead, Fenner contends that this clause should be interpreted to cover customers who had dealings with Garrod. Moreover, Fenner agrees that "prospective" customers should be limited to those customers who are already in the process of doing some business with Fenner.

Agreement is not reasonable because there is nothing that he was exposed to at Winfield or Fenner that he did not already know from having worked in the industry previously. Therefore, Garrod contends that he should not be prohibited from soliciting Fenner's customers, particularly given his age (58) and the fact that Fenner terminated him without giving him any explanation.

APPLICABLE LEGAL PRINCIPLES

<u>Standard for Preliminary Injunctive Relief</u>

The standard to be applied when considering an application for preliminary injunctive relief is well settled:

> A party seeking a preliminary injunction ordinarily must show: (1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor.

*Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008) (citations omitted).

*Fenner Has Made a Sufficient Showing of Irreparable Harm*

Fenner maintains that it will suffer irreparable harm unless the Court issues an injunction. Fenner states that it is entitled to such relief under the Agreement, which provides that the breach of any covenant will cause "immediate and irreparable harm," and entitle Fenner to "an injunction." Fenner states its harm is irreparable since it involves the loss of customer goodwill. Garrod, though, contends that any damages could be remedied with money damages.[7]

Pennsylvania law indicates that damage to an employer's customer goodwill, built up by its former employee, is irreparable harm that warrants injunctive relief. *See, Robert*

---

[7]Garrod also argues that Fenner was dilatory in seeking injunctive relief, which belies Fenner's claim that it is suffering irreparable harm. However, the Court does not agree that Fenner was unreasonably slow in seeking injunctive relief.

12

*Half of PA, Inc. v. Feight*, 2000 WL 33223697 at *9 (Pa.Com.Pl. Jun. 29, 2000) (collecting cases). In this action, it is clear that whatever goodwill Garrod built up for Winfield and Fenner during his twelve years of employment with those companies is now the property of Fenner. Moreover, Garrod's experience as Fenner's "Business Development Manager," including his knowledge of Fenner's business practices and his frequent contact with clients, could well enable him to benefit Mearthane at the expense of Fenner's goodwill. *See*, *CentiMark Corp. v. Lavine*, 2011 WL 3209106 at *4 (W.D.Pa. Jul. 28, 2011) ("This Court agrees that Lavine's position as a former salesperson for CentiMark gives him the customer relationships and information necessary to contact current and prospective CentiMark customers on behalf of Great Lakes, thereby damaging CentiMark's current and potential customer relationships. Damage to customer relationships has been held to constitute irreparable harm."); *Plate Fabrication & Machining, Inc. v. Beiler*, No. Civ.A.05-2276, 2006 WL 14515 at *7 (E.D.Pa. Jan. 3, 2006) ("Without the ability to enforce the [non-solicitation] covenant through injunctive relief, Plate would be forced to compete against the investment it made in creating and establishing a positive reputation with [its customers, and would be thereby irreparably harmed].").

A finding of irreparable harm is further supported by the Agreement, which expressly provides that a breach will result in such harm. *See, Telamerica Media Inc. v. AMN Television Marketing*, No. CIV. A. 99–2572, 1999 WL 1244423 at *6 (E.D.Pa. Dec. 21, 1999) (Other evidence of irreparable harm, "combine[d] with the fact that the Non-Compete Agreement explicitly states that damages are inadequate and that the parties agree to an injunctive remedy, weigh heavily in favor of a finding of irreparable injury.") For all of these reasons, the Court finds that Fenner has made a sufficient showing of irreparable harm.

13

*Fenner Has Not Shown A Likelihood of Success on the Merits Under the Non-Solicitation Covenant , Or Sufficiently Serious Questions Going To the Merits to Make Them A Fair Ground For Litigation, With A Balance Of Hardships Tipping Decidedly In Its Favor.*

The Agreement contains a Pennsylvania choice-of-law provision, and the applicable legal principles under Pennsylvania law are, in general, as follows:

> In Pennsylvania, restrictive covenants are enforceable if [1] they are incident to an employment relationship between the parties; [2] the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and [3] the restrictions imposed are reasonably limited in duration and geographic extent. [Pennsylvania] law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer. However, restrictive covenants are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living.

*Shepherd v. Pittsburgh Glass Works, LLC*,  25 A.3d 1233, 1244 (Pa.Super. 2011).  "For that reason, covenants not to compete must be strictly construed against the employer." *American Homecare Supply Mid-Atlantic LLC v. Gannon* , No. 09 CV 8207, 2009 WL 6340111  (Pa.Com.Pl. Dec. 15,  2009).

At the outset, the Court must consider Garrod's argument that the Agreement is unenforceable for lack of consideration.  It is clear that a restrictive covenant "must be supported by adequate consideration," *Davis & Warde, Inc. v. Tripodi*, 420 Pa.Super. 450, 454, 616 A.2d 1384, 1387 (Pa.Super. 1992), and that,

> [i]f a [restrictive covenant] is executed at the inception of employment, the consideration supporting the covenant is the job itself.  However, when an employee enters into [such an] agreement subsequent to the commencement of employment, the restrictive covenant must be supported by new consideration in order to be enforceable.

*American Homecare Supply Mid-Atlantic LLC v. Gannon*, 2009 WL 6340111 (citations

14

omitted).  Garrod contends, though, that the Agreement was imposed on him after he began working for Fenner, without any additional consideration.  However, the Court finds that Fenner has demonstrated a likelihood of success on that issue.

On this point, Pennsylvania Courts have found restrictive covenants to be ancillary to employment, and therefore supported by consideration, even when they are not signed the same day that employment commences. For example, in a case with facts very similar to the one at bar, the Pennsylvania Supreme Court stated:

> Becker, on this appeal, . . . asserts that the contract was not ancillary to [his] taking of employment with Beneficial's affiliated corporation, Beneficial Finance Co. of Easton, and therefore lacks consideration.
>
> To support this contention, Becker points to testimony in the record that <u>he did not sign the contract until October 10, 1953, two days after commencing work on October 8, 1953</u>, and that the contract was not binding until nine days later when it was accepted by the Beneficial Management Corporation in Newark, New Jersey.
>
> We believe that these facts fail to establish that the contract of employment was not ancillary to the taking of employment.  The evidence of record indicates that all Beneficial employees sign such an employment contract upon taking employment with Beneficial, and nothing in this record indicates that Becker was an exception to this practice. Moreover, the record reveals that a Beneficial field supervisor approved this contract on October 8, 1953 for Becker to sign, the same day that Becker started employment.
>
> It would be a far too narrow construction of 'ancillary' if we held that a contract of employment was not auxiliary to the taking of employment when the contract was prepared the day the employee commenced work, signed by the employee two days later, and accepted by the out-of-state parent corporation nine days after that. <u>As long as the restrictive covenants are an auxiliary part of the taking of regular employment, and not an after-thought to impose additional restrictions on the unsuspecting employee, a contract of employment containing such covenants is supported by valid consideration, and is therefore enforceable</u>.

*Beneficial Finance Co. of Lebanon v. Becker*, 422 Pa. 531, 535, 222 A.2d 873, 875 - 876 (Pa. 1966) (emphasis added, footnote and citation omitted); *see also, United Prods. Corp. v. Transtech Mfg., Inc.*, No. 4051 Aug. Term 2000, Control 081911, 2000 WL 33711051 at *16 (Pa.Comm.Pl. Nov. 9, 2000) ("Courts have interpreted the term ancillary broadly to include restrictive covenants executed several days after the change in employment status."); *Wincup Holdings, Inc. v. Hernandez*, No. Civ.A. 04–1330, 2004 WL 953400 at *3 (E.D.Pa. May 3, 2004)[8] ("Federal courts and Pennsylvania state courts have consistently enforced restrictive covenants despite a lapse of time between the commencement of employment and the signing of a restrictive covenant.") (collecting cases).

In the instant case, Garrod signed the Agreement either the same day that he began working for Fenner, or within two days thereafter. *See*, Garrod Aff. dated Dec. 14, 2012, ¶ 7. The record further indicates that all Winfield employees, including Garrod, were required to sign the Agreement within days of commencing work for Fenner. Furthermore, the Agreement itself recites that it was being executed in connection with Garrod commencing employment with Fenner.[9] Accordingly, Fenner has made a sufficient showing that the Agreement was ancillary to Garrod's employment and supported by consideration.

Alternatively, Garrod argues that the Court should not enforce the Agreement because it is not reasonable as applied to him, given his particular circumstances. More specifically, Garrod contends that the Agreement is unreasonable because it is not

---

[8] Garrod relies, in part, on the *Wincup* decision to support his argument that the Agreement was not supported by consideration. However, *Wincup* is factually inapposite, since there, the parties had already reached a detailed oral agreement regarding the terms of employment, which did not include a non-compete agreement, prior to the time, a few days later, that the employee was asked to sign the non-compete agreement. *See, Wincup*, 2004 WL 963400 at *4.

[9] *See*, Agreement's "Whereas" clause.

necessary to protect Fenner's legitimate interests, and is unduly burdensome to him, given his age and employment prospects.

As discussed earlier, employment-related restrictive covenants must be reasonable,[10] and the burden of proving that they are not reasonable falls on the party opposing the covenant. *See, John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 12, 369 A.2d 1164, 1169 (Pa. 1977) ("The law is clear that the burden is on him who sets up unreasonableness as the basis of contractual illegality to show how and why it is unlawful."). Under Pennsylvania law, the Court must conduct a fact-intensive inquiry:

> Post-employment restrictive covenants are subject to a more stringent test of reasonableness than covenants ancillary to the sale of a business. This heightened scrutiny stems from a historical reluctance on the part of our courts to enforce any contracts in restraint of free trade, particularly where they restrain an individual from earning a living at his trade. This close scrutiny also stems from our recognition of the inherently unequal bargaining positions of employer and employee when entering into such agreements. The determination of whether a post-employment restrictive covenant is reasonable, and therefore enforceable, is a factual one which requires the court to consider all the facts and circumstances. A restrictive covenant found to be reasonable in one case may be unreasonable in others.
>
> Generally, our determination of reasonableness . . . has involved a weighing of competing interests-that of the employer's need for protection-against the hardship of the restriction to be imposed upon the employee.

---

[10]It is not entirely clear whether, under Pennsylvania law, non-solicitation clauses must be reasonable to be enforced. See, *Plate Fabrication & Machining, Inc. v. Beiler*, 2006 WL 14515 at *6 ("The status of non-solicitation clauses is not 'free from doubt' according to the opinion in *Bell Fuel [Corp. v. Cattolico*, 375 Pa.Super. 238, 544 A.2d 450 (Pa.Super. 1988)]. More precisely, Pennsylvania law has not expressly resolved whether pure non-solicitation clauses (like the ones involved in *Bell Fuel* and here), which do not otherwise prohibit former employees from engaging in a particular occupation or field, should be subject to the test of reasonableness."). However, at least one federal district court has applied such a test of reasonableness, based on the fact that "the requirement of reasonableness is consonant with the general principles of Pennsylvania law concerning post-employment restraints." *Id.* Pennsylvania state courts have also applied the reasonableness standard to post-employment non-solicitation provisions. *See*, *Missett v. Hub Intern. Pennsylvania, LLC*, 6 A.3d 530, 538-540 (Pa.Super. 2010). Accordingly, this Court finds that the non-solicitation clause must be reasonable to be enforced.

I*nsulation Corp. of America v. Brobston*, 446 Pa.Super. 520, 529-530, 667 A.2d 729, 733 -734 (Pa.Super. 1995) (citations omitted); *see also*, *Victaulic Co. v. Tieman*, 499 F.3d 227, 237 (3rd Cir. 2007) ("[R]easonableness under Pennsylvania law is a fact-intensive inquiry; indeed, a restrictive covenant found to be reasonable in one case may be unreasonable in others.") (citation and internal quotation mark omitted). "Such relevant facts and circumstances may include the reasons why the employee's employment ended, the employee's personal circumstances, the number of times the employee has previously agreed to such provisions, the potential harm to the employer, the size of the potential pool of customers and the business climate." *Missett v. Hub Intern. Pennsylvania, LLC*, 6 A.3d 530, 539-540 (Pa.Super. 2010). Accordingly, the Court will consider and weigh the parties' competing interests.

Fenner of course maintains that enforcement is necessary to protect its confidential information and its customer goodwill. As already discussed, though, there is really no evidence at this point that Garrod has violated the confidentiality covenant. However, Garrod clearly has has solicited Fenner's customers, which arguably could harm Fenner's goodwill with its customers, and the protection of such goodwill is a legitimate use of a restrictive covenant. *See, Victaulic Co. v. Tieman*, 499 F.3d at 235 ("[I]interests that can be protected through covenants include trade secrets, confidential information, good will, and unique or extraordinary skills. Similarly, not allowing competitors to profit from an employee's specialized training and skills is a legitimate use of a covenant." (citations and internal quotation marks omitted). On this point, Garrod spent twelve years as a salesman for Winfield and Fenner, during which time he necessarily gained information about Winfield and Fenner, and their clients, as well as goodwill with the clients, that he did not have prior to such employment.

However, Garrod persuasively argues that Fenner is overstating the extent of any goodwill that he may have built up, or knowledge that he may have obtained, as a result of working for Winfield and Fenner. In this regard, he maintains that whatever information or goodwill that he may possess, which could benefit Mearthane or any other employer, is primarily the result of his years working in the EPP industry, prior to working for Winfield and Fenner, and is therefore does not belong to Fenner. As to this argument, the Court notes that Garrod has been working as an EPP salesman for almost thirty years, the majority of which (1983-1999) was prior to employment with Winfield and Fenner. The record further indicates that Garrod had significant contacts with, and knowledge about, EPP manufacturers prior to his employment with Winfield and Fenner. In fact, Winfield hired Garrod specifically because of his established relationship with Xerox Corporation. Fenner's concerns about Garrod's ability to harm its sales also seem overstated in light of the fact that he has yet to close any sales since commencing work for Mearthane.

Garrod further contends that Fenner's arguments about his knowledge and goodwill, and his ability to cause harm by "poaching" Fenner's customers, are belied by the circumstances under which it terminated his employment, namely, that it removed him from the company's most profitable accounts and then terminated him, apparently for what it viewed as his unsatisfactory performance. This point is significant, since Pennsylvania cases clearly express a heightened solicitude for employees who are terminated by their employers. In fact, Pennsylvania generally disfavors enforcement of restrictive covenants against employees who are fired for poor performance, on the theory that the employer views such employees as "worthless." *See, Colorcon, Inc. v. Lewis*, 792 F.Supp.2d 786, 799-801 (E.D.Pa. 2011) ("[E]nforcement of a non-competition agreement against an employee terminated for poor performance is generally

disfavored.") (Discussing *Insulation Corp. of America v. Brobston*, cited earlier, in which the court determined it would be unreasonable "to permit the employer to retain unfettered control over that which it has effectively discarded as worthless to its legitimate business interests."); *see also, All-Pak, Inc. v. Johnston*, 694 A.2d 347, 352 (Pa.Super. 1997) ("[T]he fact that the employee was terminated, rather than quit voluntarily, [is] an important factor when considering the enforceability of a restrictive covenant."). [11] This factor therefore supports Garrod's contention that enforcing the Agreement would be unreasonable.

Garrod further contends that enforcement of the Agreement would not be reasonable, in light of facts concerning his age, experience, the EPP industry and the economy generally. More specifically, Garrod contends that enforcement of the non-solicitation clause would completely prevent him from earning a living, since the EPP industry, in which he has spent his entire career, comprises a small number of buyers, many of whom are customers of Fenner. He also emphasizes that he is at an age when it will be difficult for him to find work outside of the EPP industry, as shown by his experience after Fenner terminated his employment. The Court may appropriately consider such factors in deciding whether to enforce a post-employment restrictive covenant. *See, Insulation Corp. of America v. Brobston*, 667 A.2d at 737 (Discussing factors that should be considered, including: "What effect will the restraint have on employee's life? Will it deprive him of opportunity of supporting himself and his family in reasonable comfort? Will it force him to give up the work for which he is best trained[?] What are business conditions?"); *see also, Missett v. Hub International Pennsylvania*,

---

[11]But see, *Shepherd v. Pittsburgh Glass Works, LLC*, 25 A.3d. at 1246 ("It is clear that a restrictive covenant can be enforced even if an employee is terminated by an employer, and the fact that an employee was fired without reason, *standing alone*, will not prevent a non-compete from being upheld.") (emphasis added, citation omitted).

LLC, 6 A.3d at 538-540 (discussing same factors).

Considering all the relevant factors in the record, and weighing the parties' competing interests, the Court finds that Fenner has not shown, at this time, that it is likely to prevail on the merits of its claim, or that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in Fenner's favor. Instead, the Court finds that Garrod is likely to prevail in demonstrating that enforcement of the non-solicitation clause against him would not be reasonable, for the reasons discussed. Accordingly, the Court finds that Fenner is not entitled to a preliminary injunction.

CONCLUSION

Fenner's renewed application for preliminary injunctive relief is denied.


SO ORDERED.

Dated: Rochester, New York
     February 4, 2013

                          ENTER:


                          /s/ Charles J. Siragusa
                          CHARLES J. SIRAGUSA
                          United States District Judge